SUN RIVER STOCK & LAND CO., RESPONDENT, *v.* MON-
TANA TRUST & SAVINGS BANK, EXECUTOR, APPEL-
LANT.

(No. 6,190.)

POWER, GUARDIAN, RESPONDENT, *v.* MONTANA TRUST &
SAVINGS BANK, EXECUTOR, APPELLANT.

(No. 6,191.)

POWER, RESPONDENT, *v.* MONTANA TRUST & SAVINGS
BANK, EXECUTOR, APPELLANT.

(No. 6,192.)

POWER, TRUSTEE, RESPONDENT, *v.* MONTANA TRUST &
SAVINGS BANK, EXECUTOR, APPELLANT.

(No. 6,193.)

POWER, TRUSTEE, RESPONDENT, *v.* MONTANA TRUST &
SAVINGS BANK, EXECUTOR, APPELLANT.

(No. 6,194.)

POWER, RESPONDENT, *v.* MONTANA TRUST & SAVINGS
BANK, EXECUTOR, APPELLANT.

(No. 6,195.)

POWER, ADMINISTRATOR, RESPONDENT, *v.* MONTANA TRUST
& SAVINGS BANK, EXECUTOR, APPELLANT.

(No. 6,196.)

(Submitted November 25, 1927.  Decided January 6, 1928.)

[262 Pac. 1039.]

*Corporations — Who may Challenge Existence — Collateral At-
tack — How Existence may be Terminated — Failure to
Exercise Corporate Functions—Effect on Corporation—Part-
nership — Public Policy — Estoppel — Promissory Notes —
Guaranty—Contribution—Subrogation.*

Corporations—How Existence may be Terminated.
   1. A corporation, being a creature of the state, continues in
   existence until deprived thereof by action of the state, or by

[81 Mont. 222.]

the lapse of the period of life provided by law, or by the dissolution of the corporation by permission of the state, whether it be one de jure or de facto.

Same—De Facto Corporation—State Alone may Challenge Existence.
2. Where the records of the secretary of state show that a company has been regularly incorporated and is carrying on business as a corporation, it must be considered at least a corporation de facto, and the state alone, by a direct proceeding for that purpose, can challenge its existence or its right to do business in the state.

Same—"Dummy" Directors—Collateral Attack.
3. While the statute contemplates that for the formation of a corporation there shall be at least three incorporators, the fact that one of the three had no interest in it—a "dummy" holding but two shares given him by the other two who held the remainder—did not result in the destruction of the corporation; the corporation having been organized under state law which had been colorably complied with, followed by an exercise of corporate functions, was at least a corporation de facto, immune to collateral attack.

Same—Failure to Elect Directors—Effect on Existence of Corporation.
4. A corporation de facto is not deprived of the right to exercise corporate functions by the failure of its directors to perform corporate actions or for the failure of stockholders to elect directors, even though the taking of these steps is necessary to the proper use of the franchise granted.

Same—Effect of Two Corporators Holding Virtually Entire Capital Stock.
5. Where the entire capital stock of a corporation, with the exception of two shares held by a "dummy" who had paid nothing for them, was in the hands of the other two corporators, its ownership did not vest the two with title to the corporate property, the ownership of the stock carrying with it only an equitable interest in the property. (*Teittig* v. *Boesman*, 12 Mont. 404, if intended to declare a different doctrine, overruled to that extent.)

Same—Public Policy Forbids Partners to be Corporation to World at Large and Partners as Between Themselves.
6. Public policy will not allow partners to be a corporation as to the rest of the world while as between themselves the enterprise, conducted in the corporate form, is in fact a partnership.

Same—Estoppel.
7. One who has recognized the legal entity of a corporation by dealing with it as such may not object to any defect in its

---

2. See 6 Cal. Jur. 662; 7 Cal. Jur. 68.
3. What constitutes de facto corporation, see notes in 118 Am. St. Rep. 253; 24 L. R. A. 293. See, also, 7 R. C. L. 62.
Collateral attack on corporation, see note in 33 Am. St. Rep. 180. See, also, 6 Cal. Jur. 660; 7 Cal. Jur. 159; 7 R. C. L. 68.
4. Defective formation of corporation and its consequences, see note in 33 Am. St. Rep. 176. See, also, 7 R. C. L. 64.
5. See 7 R. C. L. 26.
7. Estoppel to deny corporate existence and capacity, see notes in 33 Am. St. Rep. 184; 94 Am. St. Rep. 596. See, also, 6 Cal. Jur. 663; 7 R. C. L. 106.

organization, is estopped to question its de facto existence and cannot hold members of the corporation as partners.

Same—Estoppel.

8. On grounds of public policy, one who aided in bringing a corporation into existence as one of its incorporators and under which he and his associates have carried on business, is estopped to deny its existence as a corporation, either in his personal capacity or in the capacity of trustee, guardian or administrator.

Same—Equitable Rule That Courts will Hold Stockholders to Personal Liability in Certain Cases Inapplicable, When.

9. The rule that in certain cases equity will refuse to recognize a corporate entity as distinguished from the stockholders, will look behind the corporate cloak and hold stockholders to a personal liability for debts incurred, *held* inapplicable to the facts in a case in which it was sought to fasten liability for corporate debts upon the estate of a stockholder on the ground that the corporation was in fact a copartnership.

Appeal—Language in Opinions of Supreme Court to be Understood in Connection With Facts of Particular Case.

10. In considering the meaning and intent of language used in an opinion of the supreme court, the facts of the particular case must be kept in mind, it being impossible to so use language as that general expressions apply in every instance with the same meaning to every condition of facts.

Promissory Notes—Guaranty—Contribution—Subrogation.

11. One of two guarantors of a promissory note of a corporation which was insolvent paid a large part of it in cash giving a renewal note in behalf of the corporation indorsed by him personally for the remainder, the payee bank looking to him for its payment and delivering to him the joint guaranty. *Held* in an action by such guarantor against the estate of his coguarantor upon rejection of his claim for contribution, that plaintiff was subrogated to the rights of the payee bank and entitled to judgment against the estate for one-half the amount paid by him, under the doctrine of contribution.

---

[1]  Corporations, 14 **C. J.**, sec. 182, p. 179, n. 37.

[2]  Corporations, 14 **C. J.**, sec. 173, p. 168, n. 21; sec. 216, p. 204, n. 21.

[3]  Corporations, 14 **C. J.**, sec. 230, p. 222, n. 57, 59.

[4]  Corporations, 14 **C. J.**, sec. 217, p. 208, n. 29; sec. 230, p. 222, n. 58; sec. 231, p. 223, n. 77; sec. 1283, p. 843, n. 72.

[5]  Corporations, 14 **C. J.**, sec. 1322, p. 866, n. 38.

[6–8]  Corporations, 14 **C. J.**, sec. 236, p. 228, n. 14; sec. 237, p. 231, n. 27; sec. 259, p. 237, n. 3; sec. 279, p. 250, n. 17, 14a **C. J.**, sec. 3723, p. 1114, n. 4.

[9]  Corporations, 14 **C. J.**, sec. 22, p. 61, n. 78.

[10]  Courts, 15 **C. J.**, sec. 376, p. 970, n. 30.

[11]  Guaranty, 28 **C. J.**, sec. 219, p. 1040, n. 25.

Estoppel to allege partnership liability of stockholders in case of defective or illegal incorporation, see note in **L. R. A.** 1916C, 212.

8. Estoppel of stockholder to deny corporate existence, see note in **Ann. Cas.** 1915A, 411. See, also, 7 **R. C. L.** 107.

9. Disregarding corporate existence, see note in 1 **A. L. R.** 610. See, also, 6 **Cal. Jur.** 591; 7 **R. C. L.** 27.

10. See 7 **R. C. L.** 1003.

*Appeal from District Court, Lewis and Clark County; W. H. Poorman and A. J. Horsky, Judges.*

Consolidated Actions by the Sun River Stock & Land Company, by Charles B. Power, as guardian, by Charles B. Power individually, by Charles B. Power, as trustee for Gordon Lamey, by Charles B. Power, as trustee for Ella G. Lamey, and by Charles B. Power, as administrator of the estate of Mabel L. Power, deceased, all against the Montana Trust & Savings Bank, as executor of the last will and testament and estate of John H. Burke, deceased. Judgments for plaintiffs, and defendant appeals. Reversed, with direction, as to all judgments except judgment in suit brought by Charles B. Power individually (cause No. 6192); as to that affirmed.

*Mr. Harry P. Bennett, Mr. T. B. Weir* and *Mr. W. G. Gilbert,* for Appellants, submitted briefs and argued the cause orally.

*Messrs. Cooper, Stephenson & Hoover, Amici Curiae,* submitted a brief; *Mr. Sam Stephenson* arguing orally.

*Messrs. Walsh & Nagle,* for Respondent, submitted briefs and a reply brief to that of *amici curiae; Mr. Raymond T. Nagle* argued the cause orally.

## Opinion: PER CURIAM.

These appeals are from judgments of the district court of Lewis and Clark county declaring that the creditors' claims hereinafter mentioned are just and valid claims against the estate of John H. Burke, deceased, and ordering their payment in due course of administration.

There are seven suits, numbered 6,190 to 6,196, inclusive. In each Montana Trust & Savings Bank, as executor of the last will and testament of John H. Burke, deceased, is defendant. In 6,190 Sun River Stock & Land Company, a corporation, is plaintiff; in 6,191 C. B. Power, as guardian, is

plaintiff; in 6,193 and 6,194 C. B. Power, as trustee, is plaintiff; in 6,196 C. B. Power, as administrator, is plaintiff; in 6,192 and 6,195 C. B. Power is plaintiff.

In all of the cases except 6,192 the main issue is the same, and it is whether a concern called the Rock Creek Ranch Company was a corporation or a partnership.

In 1910 James P. Porter, as agent for D. A. G. Floweree, offered to sell to John H. Burke and Charles B. Power the Rock Creek ranch, near Wolf Creek, in Lewis and Clark county. The offer appearing attractive Burke and Power, who were intimate friends, visited the property, and agreed to buy it for the sum of $85,000: Their intention was to engage in the livestock business upon a large scale. They started out with the understanding that they were to be equal partners. After they had agreed to purchase the ranch, and while matters were still in the preliminary stage, it occurred to them that the enterprise should be segregated in some manner, "more largely from a bookkeeping standpoint," as Mr. Power said, to keep it separate from the other activities of the actors. Burke had a livestock business run under his own name, and, whether at that time or later, he also was engaged largely in that business with one Taylor. Power, in connection with others, had livestock companies run under different names. In order to keep the new business "as an outstanding arrangement," said Mr. Power, "we put it in the form of a corporation." In the conduct of the business it was understood that Burke, being a competent livestock man, was to run the ranch, buy the stock, and to attend to "those details"; the office work and keeping track of its transactions was to be the duty of Power. The two were to be equal owners in the enterprise.

Each advanced $5,000 in cash toward the purchase of the ranch; the remainder of the purchase price was borrowed.

In order to proceed with the incorporation Burke and Power called in their personal friend, Charles F. Word, an attorney at law, and on June 2, 1910, these three executed articles of

incorporation for a ranch and livestock company, reciting that the name of the company should be Rock Creek Ranch Company. These articles were filed with the county clerk of Lewis and Clark county on June 13, 1910, and a certified copy of the articles was filed with the secretary of state, who issued his certificate of incorporation on that day. In the articles, Burke, Power and Word were named as directors for the first three months.

On June 13, 1910, these three met as stockholders of the corporation and adopted a resolution which recited that whereas a proposition had been received from John H. Burke and Charles B. Power offering to sell and convey to the company 13,062 acres of land situate near Wolf Creek in Lewis and Clark county, and known as the Rock Creek ranch, together with certain farming machinery and personal property thereon, in consideration of the issuance to them of all the capital stock of the company and the execution of a promissory note for $45,000 payable in three years after date to the order of W. G. Langford, with interest at the rate of seven per cent per annum, and the execution of a mortgage upon the premises to Langford as security for the payment of the note, and whereas, in the judgment of the stockholders and subscribers to the capital stock of the company, the proposition seemed fair and reasonable and the property offered worth the price asked therefor, it was resolved that the board of directors be authorized and directed to accept the proposition and to purchase the property and to cause the stock to be issued and the note and mortgage to be executed and delivered, by the proper officers of the company.

The stockholders adopted comprehensive by-laws for the government of the Rock Creek Ranch Company, wherein provisions were made for stockholders' meetings; for the management of the company by three directors, the election of directors, meetings of the directors and so forth; relating to officers of the corporation and their powers and duties; respecting the stock of the corporation; adopting a corporate

seal; providing for the fiscal or business year of the company, the declaration of dividends, for the amendment and repeal of by-laws; and giving the board of directors power to make rules and regulations concerning the registration of certificates of stock of the company. The by-laws were signed by the three and attested by the secretary. On the same day the directors met and elected Burke president, Power vice-president, and Word secretary and treasurer. During the meeting, the directors adopted a resolution in conformity with that adopted by the stockholders.

Burke and Power then caused Floweree and wife, under date of June 17, 1910, to execute a deed for the ranch property, to "Rock Creek Ranch Company, a corporation organized and existing under the laws of the state of Montana," and in due time the note and mortgage were executed to Langford. Burke as president and Word as secretary, on June 18, 1910, issued 249 shares of stock to Burke, 249 to Power and 2 to Word. These certificates were signed by Burke as president and Word as secretary, and the seal of the corporation was affixed to each. Word did not pay anything for his stock. He indorsed the certificate in blank.

The day the company started to do business it opened up a bank account in the corporate name, and all the ranch money went through that account.

Simultaneously with the purchase of the ranch, arrangements were made to finance the operations of the company. Burke and Power were to try to get the money from where each had the most direct connection. Burke, who was doing considerable business with the First National Bank of Great Falls, borrowed from that bank; Power borrowed from the American National Bank of Helena; and together they borrowed from the National Bank of Montana. For these loans notes were given, signed by Rock Creek Ranch Company, indorsed by Burke and Power.

On May 27, 1912, Burke and Power executed a continuing guaranty to the American National Bank in behalf of Rock

Creek Ranch Company, whereby they guaranteed to the bank full and prompt payment at maturity on all notes executed by Rock Creek Ranch Company to the bank, and upon notes, bills receivable, drafts, acceptances, or other evidences of indebtedness, which the bank might thereafter discount or cash for the company. Apparently the company needed larger amounts of money than the banks were willing to supply, and resort was made to other sources. Large sums of money were borrowed for which notes were given in the corporate name. Those which are affected in these suits will now be mentioned.

On December 31, 1916, Mabel L. Power, the wife of C. B. Power, loaned to the company $115,950.78, and received a note for that amount dated on that day, signed by Rock Creek Ranch Company, by John H. Burke, president. Interest was paid for a time, after which notes were given for the interest. The principal note and the interest notes are the basis of action No. 6,196.

On December 31, 1916, Charles B. Power as guardian of Margaret Power, Charles Benton Power, Jr., and Jane Elizabeth Power, minors, loaned to the company $55,242.63, for which the company executed its note, payable to Charles B. Power, guardian, in that amount. The note is signed "Rock Creek Ranch Company, by John H. Burke, President." Interest was paid on this note for a time, and thereafter notes were given for interest. Principal and interest notes are the basis of action No. 6,191.

On January 2, 1920, C. B. Power, as trustee for Mrs. Ella Lamey, loaned the company $20,000. As evidence of this indebtedness, there was executed a promissory note signed by Rock Creek Ranch Company, by C. B. Power, vice-president. The note was also signed by C. B. Power. On March 1, 1920, C. B. Power, as trustee for Gordon Lamey, loaned the company $10,000, for which a note was executed, signed by Rock Creek Ranch Company, by C. B. Power. Some payments have been made on the principal, and interest was paid in full

to June 1, 1924. These notes are the basis of actions Nos. 6,193 and 6,194.

The facts relating to action No. 6,192 will be stated in their appropriate place.

The administrative business of the company was carried on by Burke and Power. Mr. Word died in 1912. The stock standing in his name was canceled and reissued in the name of E. C. Day, who was elected a director in place of Mr. Word. Mr. Day did not pay anything for the stock, but, as he testified, he performed the services Burke and Power requested him to perform. He was paid for his services. The certificate of stock issued to him was left in the book, as were the certificates of Burke and Power. The Day certificate was not indorsed.

On August 5, 1918, Burke, Power and Day caused the capital stock of Rock Creek Ranch Company to be increased from $50,000 to $200,000, and the secretary of state certified accordingly. No meetings of stockholders or directors were held after that time. The newly authorized stock was never issued.

Rock Creek Ranch Company filed income tax reports and capital stock statements. Neither Burke nor Power, in making personal income tax returns to the government, ever made any reference to Rock Creek Ranch Company. Burke employed a bookkeeper who, among other things, kept an account relating to the personal financial transactions of Mr. Burke, but no reference was ever made therein to the Rock Creek Ranch Company. Mr. Burke died October 8, 1923, testate. Letters testamentary were issued to the defendant. The Burke estate is insolvent in any event. Creditors' claims, not including those involved in these suits, in excess of $230,000, have been allowed.

On December 10, 1924, Rock Creek Ranch Company commenced an action against the defendant executor, based upon an open account between that company and John H. Burke, in which it was alleged that plaintiff had furnished to Burke

goods, wares and merchandise and also had expended money in his behalf and at his special instance and request. The complaint was verified by Charles B. Power, who swore that he was then president of the plaintiff, which was described as a corporation duly organized and existing under the laws of the state of Montana.

In due time Mr. Power, taking the position that Rock Creek Ranch Company was not a corporation, but a partnership between himself and John H. Burke, presented claims to the defendant, as executor of Burke's will, based upon the promissory notes mentioned above. In addition to those presented by Power in his respective capacities as guardian, trustee and administrator, he presented what counsel call a creditor's contingent claim, designed to establish a claim against the Burke estate for the one-half part of all debts owing by Rock Creek Ranch Company, in the sum of $394,855.08; the claim is based upon seventeen promissory notes executed by Rock Creek Ranch Company, four of which are dated after Burke's death, and five open accounts, each of which includes some item dated after Burke's death.

The Sun River Stock & Land Company, a corporation, of which Mr. Power is president, likewise alleging that Rock Creek Ranch Company was a partnership, presented a claim against the Burke estate, based upon an open account between the two companies. The executor having rejected all the claims, suits were commenced upon each. After the pleadings were made up, the cases came on for trial.

The court found that, for the purpose of qualifying Word to act as director and to keep the equality between Burke and Power undisturbed, they each had one share of stock transferred to Word; that the shares were never delivered to Word; that he never paid anything for the stock, had no financial interest in the corporation whatever, and never took part in its management; that, when Word died, the two shares of stock written in his name were canceled and transferred to Day; that Day did not pay anything for the stock, had no

financial interest in the business and never took any part in its management other than to attend for the purpose of electing officers, and the business was managed solely and exclusively by Burke and Power. From these facts it concluded as a matter of law that the Rock Creek Ranch Company was not and is not a bona fide corporation; that neither Word nor Day was a bona fide stockholder of the corporation and was not qualified to act as a director; that ostensibly putting two shares of stock in the names of either did not qualify him to act as a director of the corporation. The court concluded that "to all intents and purposes" Burke and Power were partners, and thereupon rendered judgment for the respective plaintiffs for the amounts claimed except in the suit based upon the contingent claim, or the composite case, as it came to be called. In that case the court disallowed the claims which were allowed in the other suits, rendering judgment for the plaintiff upon claims not otherwise embraced, as follows: Upon notes executed by Rock Creek Ranch Company to Margaret Larson, amounting to $30,000; upon an open account owing by Rock Creek Ranch Company to T. C. Power & Bro., in amount $553.83; upon an open account owing by Rock Creek Ranch Company to C. B. Power to the amount of $31,367.69. It was adjudged that C. B. Power is separately liable for the amount due upon the Larson notes and the T. C. Power & Bro. account, and that he is entitled, upon payment of the same by him, to reimbursement from the estate of Burke to the extent of one-half, and that, upon the date the personal claim of Power was presented to the defendant executor, there was due Power from the Burke estate one-half of $31,367.69. Appropriate directions were made as to the payment of the sums found due in due course of administration. Hence these appeals.

All the cases, except No. 6,192, which will be reached later in this opinion, depend upon a solution of the decisive question: Can the estate of John H. Burke, under the facts disclosed, be held to partnership liability on account of the business of the Rock Creek Ranch Cmpany?

The importance of this group of cases, and of the principles involved, the fact that the learned jurists who sat in the trials evidently followed what they deemed to be the holdings of this court in arriving at their conclusions, and the far-reaching effect of an affirmance of the judgments, have caused us to consider the problems presented with great care. Three members of the court have given exclusive attention to these cases for days at a time, and their associates have been called into frequent conferences. An exhaustive examination of the authorities cited, and a great many others, has been made.

1. It may be admitted that Burke and Power, at the inception of their enterprise, had in mind the formation of a partnership. Instead they concluded to form a corporation, and to accomplish that purpose called to their aid Mr. Word. That in forming the corporation all proceeded in the utmost good faith there cannot be the slightest doubt. The corporators prepared articles of incorporation which, upon their face, were in strict conformity with the law. The business intended to be carried on was lawful. All the statutory prerequisites, so far as could be ascertained by the secretary of state from the face of the papers, having been complied with, that officer issued to them a certificate of incorporation, a charter.

The grant of the franchise to be a corporation is an exercise [1] of the sovereign power of the state, creating a contract between the state and the corporation and its members. "The consent of the state is expressed in the grant, and that of the corporators in the acceptance of the privilege." (*Beyer* v. *Woolpert,* 99 Minn. 475, 109 N. W. 1116.) The corporation being granted life by the act of the sovereignty, nothing less than the act of that power, or the lapse of the period of life provided by law, or the dissolution of the corporation by the permission of the sovereignty, can take that life away. And this is true whether the corporation be de jure or de facto. It is true, of course, that under some conditions the functions of a corporation may be in abeyance, but nevertheless its existence as a corporation continues.

It would seem that the judges of the trial court were of the opinion that, as Burke and Power originally intended to become partners and continued equal owners in the enterprise, which they managed themselves, and as neither Word nor Day had any financial interest in the business, it followed that there was not any bona fide corporation. The conclusion of the trial court strikes at the very fundamentals which go to the creation of a corporation.

If it should be held that a corporation cannot be created by three persons, otherwise qualified, because one of them has no financial interest in the proposed corporation, which nevertheless in form is created, and the two bona fide corporators thus become partners and liable for the corporate debts, no matter when incurred, that pronouncement would affect vitally many business interests of this state, for it is a matter of common knowledge that for years large numbers of commercial, mining, stock raising and other industrial corporations have been formed in that way. Many corporations have been formed with two dummy incorporators. A solvent stockholder having but a single share of stock, being declared a partner, might find himself insolvent by reason of the debts of the corporation.

Moreover, a pertinent inquiry arises: If the law is in this [2] condition, how can a third person deal safely with one who owns stock in a corporation of whose internal affairs the third person knows nothing? The answer must be that one has a right to rely upon the public records, and, if the records in the office of the secretary of state show that a company has been regularly incorporated and the company is carrying on business as a corporation it must be considered at least a corporation de facto. The action of the secretary of state, upon the conditions here presented, was a determination of the corporation's right to do business. The state alone, by a direct proceeding for that purpose, can challenge the corporation's existence or its right to do business in this state. (*Boatmen's Bank* v. *Gillespie,* 209 Mo. 217, 108 S. W. 74; *Henderson* v. *School Dist. No. 44,* 75 Mont. 154, 242 Pac. 979.)

A copy of any articles of incorporation filed in pursuance of Chapter 1, Part. 3, of the Civil Code, and certified by the secretary of state, must be received in all courts and other places as prima facie evidence of the facts therein stated. Likewise the certificate of incorporation issued by the secretary of state must be admitted in evidence in all courts of this state, "and shall be prima facie evidence of the corporate character and capacity of such corporation and of its right to transact business in this state, excepting in an action prosecuted by the state in the nature of a quo warranto proceeding." (Secs. 5913, 5914, Rev. Codes 1921.)

"Though the statute providing for the formation of corpo-
[3]   rations requires that there shall be a certain number of incorporators, in practice this provision is frequently evaded by the person or persons really interested in the formation of the corporation associating with himself or themselves persons who have no interest, present or contemplated, in the proposed corporation, and the validity of a corporation so formed has been frequently upheld against collateral attacks." (Fletcher on Corporations, sec. 109; *State* v. *Miner,* 233 Mo. 312, 135 S. W. 483; *Rehbein* v. *Rahr,* 109 Wis. 136, 85 N. W. 315.)

When persons assume to act as a body, and are permitted by the acquiescence of the public and the state to act as if they were legally a particular kind of corporation, for the organization, existence and continuance of which there is express recognition by the general law, such body of persons is a corporation de facto, although the particular persons thus exercising the franchise of being a corporation may have been ineligible and incapacitated by the law to do so. (Fletcher on Corporations, sec. 293.)

A corporation de facto exists when it is shown that there is
[4]   a law under which a corporation with the powers assumed might lawfully be created, a colorable compliance with the requirements of the law, and a user through the exercise of corporate functions of the rights claimed to be conferred by the law. (*Methodist Episcopal Union Church* v. *Pickett,* 19 N. Y.

482; *Snider's Sons' Co.* v. *Troy*, 91 Ala. 224, 24 Am. St. Rep. 887, 11 L. R. A. 515, 8 South. 658; *Johnson* v. *Okerstrom*, 70 Minn. 303, 73 N. W. 147.)

" 'Color of apparent organization under some charter or enabling Act' does not mean that there shall have been a full compliance with what the law requires to be done, nor a .substantial compliance. A substantial compliance will make a corporation de jure." (*Finnegan* v. *Noerenberg*, 52 Minn. 239, 38 Am. St. Rep. 552, 18 L. R. A. 778, 53 N. W. 1150.)

Upon the admitted facts it must be held that the Rock Creek Ranch Company was at least a corporation de facto. A corporation thus in existence is not deprived of the right to exercise corporate functions by the failure of its directors to perform corporate actions, or for the failure of stockholders to elect directors, even though the taking of these various steps is necessary to the proper use of the franchise. (*Daily* v. *Marshall*, 47 Mont. 377, 133 Pac. 681.) We do not understand that anything said in *Teitig* v. *Boesman*, 12 Mont. 404, 31 Pac. 371, was intended to declare a contrary rule.

A corporation de facto may legally perform every act that it might were it de jure, for, as against all the world except the paramount authority it occupies the position of a valid corporation. (6 Cal. Jur. 659.) It can no more be attacked collaterally than can a corporation de jure. (*Daily* v. *Marshall*, supra.) That neither the state nor private individuals may attack its existence collaterally is reckoned as axiomatic. (Fletcher on Corporations, sec. 274; *Henderson* v. *School Dist. No. 44*, supra; Thompson on Corporations, 3d ed., sec. 253; *Mitchell* v. *Jensen*, 29 Utah, 346, 81 Pac. 165; *Pape* v. *Capitol Bank of Topeka*, 20 Kan. 440, 27 Am. Rep. 183.)

As to the partnership liability of Burke, Power and Word, to say nothing of Day: In the leading case of *Jackson* v. *Hooper*, 76 N. J. Eq. 592, 27 L. R. A. (n. s.) 658, 75 Atl. 568, Judge Dill used the following language, which is appropriate to the cases at bar: "It is claimed, however, that these owners of all the stock were really copartners, doing business in cor-

porate form for their own convenience, and that a court of
equity has the power to control the property and affairs of
the companies even to the extent of eliminating the corporate
functions and powers as mere incidents and wholly disregard-
ing the substantive law governing the creation, supervision,
and dissolution of corporations.   We cannot subscribe to any
such doctrine.   *   *   *   The law never contemplated that per-
sons engaged in business as partners may incorporate, with in-
tent to obtain the advantages and immunities of a corporate form,
and then, Proteuslike, become at will a copartnership or a cor-
poration, as the exigencies or purposes of their joint enterprise
may from time to time require.   The policy of the law is to
the contrary.   If the parties have the rights of partners, they
have the duties and liabilities imposed by law and are respon-
sible *in solido* to all creditors.   If they adopt the corporate
form with the corporate shield extended over them to protect
them against personal liability, they cease to be partners, and
have only the rights, duties, and obligations of stockholders.
They cannot be partners *inter sese* and a corporation as to the
rest of the world.'' To the same effect are *Thomashefsky* v.
*Edelstein,* 192 App. Div. 568, 182 N. Y. Supp. 707; *Berger* v.
*Eichler,* 211 App. Div. 479, 207 N. Y. Supp. 147; *Boag*
v. *Thompson,* 208 App. Div. 132, 203 N. Y. Supp. 921; *Brock*
v. *Poor,* 216 N. Y. 387, 111 N. E. 229.

We do not overlook the fact that a partnership, in carrying
on its activities, may cause corporations to be formed for the
operation of portions of its business and that the partnership,
or the partners, may own all of the corporate stock.   But that
is not this situation.   This entity, Rock Creek Ranch Com-
pany, was either a partnership or a corporation; it could not
be both.   If a partnership, it was a mere business association
created by the volition of Burke and Power, which by mutual
consent they might dissolve at will; if a corporation, it was a
creature of the sovereignty, dissoluble only in accordance with
the statutes of this state.

It is argued by counsel for respondents that Burke and Power did not have the idea of corporate immunity in mind, as is shown by their repeated indorsement of notes executed by Rock Creek Ranch Company. This argument is a two-edged sword, for, if the concern was a partnership, why was it necessary for the partners, already liable, to indorse the notes? We find them in other instances executing notes as if executed by a corporation, without indorsement. One of these is also signed by C. B. Power as a maker.

It is said that Burke and Power became individually liable because they did not file statements with the county clerk showing the corporation's condition. True, but this does not depend upon any principle of partnership liability.

As we have seen, the ranch property was conveyed to Rock [5] Creek Ranch Company, a corporation, and it is not pretended that all the personal property purchased did not and does not stand in the name of the company. The title to all that property is in the Rock Creek Ranch Company. The ownership of all the capital stock of the Rock Creek Ranch Company does not vest the owners of the stock with title to the corporate property; the ownership of the stock carries with it only an equitable interest in the property. (*Barnes* v. *Smith,* 48 Mont. 309, 137 Pac. 541, and cases cited; *Brock* v. *Poor,* supra.) If *Teitig* v. *Boesman,* 12 Mont. 404, 31 Pac. 371, may be deemed to declare a different doctrine, it is palpably wrong, and upon that point is overruled.

So far as the public knew, Rock Creek Ranch Company was a corporation. It bore the similitude of a corporation in every way. Third persons dealt with it as with a corporation. "To an outward observer, or any one dealing with it, it has exhibited all the characteristics of a legal person living the life and pursuing the calling for which it was created, according to the course prescribed by law." (*Daily* v. *Marshall,* 47 Mont. 377, 133 Pac. 681.) The company always had a president, vice-president and a secretary (except during a short interim fol-

lowing the death of Mr. Word). No officers were elected after 1918, but that fact is of no special consequence.

Public policy will not permit a copartnership to do business **[6-8]** in the guise of a corporation, nor allow the partners to be corporation as to the rest of the world while as between themselves the enterprise, conducted in the corporate form, is in fact a joint venture. (*Seitz* v. *Michel,* 148 Minn. 80, 12 A. L. R. 1060, 181 N. W. 102.) Moreover, one who has recognized the legal entity of a corporation by dealing with it as such has no right to object to any defect in its organization, is estopped to question its de facto existence, and is not entitled to hold members of the corporation as partners. (*Newcomb-Endicott Co.* v. *Fee,* 167 Mich. 574, 133 N. W. 540; *Doty* v. *Patterson,* 155 Ind. 60, 56 N. E. 668; 2 Morawetz on Corporations, sec. 748; Thompson on Corporations, 3d ed., sec. 4850; *Seitz* v. *Michel,* supra; *Brooke* v. *Day,* 129 Ga. 694, 59 S. E. 769; *Nebraska Nat. Bank of York* v. *Ferguson,* 49 Neb. 109, 59 Am. St. Rep. 522, 68 N. W. 370.)

In *Doty* v. *Patterson,* supra, it was held that the rule that corporate existence of a de facto corporation cannot be attacked collaterally is not limited to cases where one by contract admits corporate existence, but is one of general application. That was a case wherein it was sought to dissolve an alleged partnership on the theory that those who undertook to form a corporation, but failed to comply with some of the formalities of the law, were partners. After holding that the concern was a corporation de facto, the court held that the stockholders could not be held liable as partners, and said that the rule established by the great weight of authority is that the stockholders in a de facto corporation cannot be so held, although there have been irregularities, omissions and mistakes in incorporating the company, citing Clark on Corporations, 99–110, 1 Cook on Corporations, 4th ed., sec. 234, and a long list of other authorities. "The creditor cannot proceed against the stockholders as partners, without proving noncompliance with prescribed conditions precedent, thus inquiring collater-

ally, not into the fact, but the legality of its existence.   *   *   *
'Furthermore, persons who have contracted with a corporation
as such, and have acquired claims against it, are estopped
from denying its corporate existence for the purpose of hold-
ing its shareholders, liable as partners.' "   (*Snider's Sons' Co.*
v. *Troy,* supra; *Cory* v. *Lee,* 93 Ala. 468, 8 South. 694; *Bush-
nell* v. *Consolidated Ice Mach. Co.,* 138 Ill. 67, 27 N. E. 596.)

That one of the corporators may not deny the existence of
the corporation he has caused to be brought into existence
and under which he and his associates have carried on business
is patent.   He is estopped to do so, not upon the ground of
equitable estoppel, but upon that of public policy.   (*Sanger*
v. *Upton,* 91 U. S. 56, 23 L. Ed. 220.)

"The principle that shields the members from the claims of
persons dealing with the corporation under such circumstances
is equally efficacious to protect the members as between them-
selves.   There being no fraud shown to have been committed
by defendants, the members were all parties to whatever was
done and stood in equal relations to all the facts.   Neither
should now be permitted to take advantage of his own wrong;
and, so far as any wrong was done, the members were *in pari
delicto.*"   (*Perkins* v. *Fish,* 121 Cal. 317, 53 Pac. 901.)

Power cannot personally deny the existence of the corpo-
ration.   If in his representative capacity he may be said to
stand in the position of a third person, he may not deny it.
He dealt with the Rock Creek Ranch Company as a corpora-
tion, which he may not deny.   (*Pape* v. *Capitol Bank of
Topeka,* supra.)   He cannot now be heard to say in his repre-
sentative capacity what he is not permitted to say in his per-
sonal capacity.   There is nothing in the record to indicate
that Mrs. Power, when she loaned the Rock Creek Ranch Com-
pany money on December 31, 1916, and received a note signed
"Rock Creek Ranch Company, by John H. Burke, President,"
thought she was loaning money to the copartnership and not to
a corporation.

What has been said applies to Sun River Stock and Land Company.

The provision of the law which requires that "directors of corporations for profit must be holders of stock therein in an amount to be fixed by the by-laws of the corporation" (sec. 5933, Rev. Codes 1921) unquestionably contemplates that the directors shall be bona fide holders of the qualifying stock. (*Barnes* v. *Smith,* supra; *Scott* v. *Prescott,* 69 Mont. 540, 223 Pac. 490.)    But, if they are not, it does not follow that a dissolution of the corporation results.    The statutes which relate to the dissolution of a corporation do not provide for a dissolution in that way.

The corporation does not for that reason alone degenerate into a "mere joint proprietorship" of the property standing in the corporate name, by the holders of the capital stock. (*Daily* v. *Marshall,* supra.)

It is true that, in exceptional cases, the courts, in order [9] to circumvent fraud, prevent inequity and accomplish justice, refuse to recognize the corporate entity as distinguished from the stockholders, if the refusal of such recognition is necessary to get at the truth.    "This statement applies especially to cases in which the corporation is used as a cloak for fraud, or to enable the owner of the stock to evade personal liability or the performance of a public duty." (*Barnes* v. *Smith,* supra.)    It is upon the Montana cases applying this doctrine that counsel for plaintiffs in their very able briefs and argument chiefly rely, and upon which, in the last analysis, the judgments appealed from rest; and to a consideration of those cases we shall now turn our attention.    In none of these cases are the facts at all similar to those which we are considering in the cases at bar.    *Edwards* v. *Plains Light & Water Co.,* 49 Mont. 535, 143 Pac. 962, though cited, has so little applicability that it need not be considered.

In *Barnes* v. *Smith,* supra, the plaintiff, who was the owner of all of the corporate stock of the Judith Basin Milling Company, induced two of the directors, who were in reality his

agents, conducting the business for his sole benefit, to indorse as guarantors a note executed and delivered by the corporation to the Empire Bank & Trust Company; the proceeds of the note having been received and used by the corporation. Plaintiff, having paid the note, brought suit against the defendant directors to recover on their contract of guaranty. Considering the circumstances and the manifest inequity of plaintiff's position, the court looked behind the corporate cloak with which plaintiff attempted to shield himself and held that he could not recover; he should be deemed the corporation itself. Speaking through Mr. Chief Justice Brantly, the court said: "When the capital stock passes into the hands of a single person, the entity of the corporation, except so far as it is necessary to protect the rights of strangers, who deal with it through its ostensible officers and agents, is entirely in abeyance, and its functions for the time being cease." The court held that one who, after acquiring all the capital stock of a corporation, makes use of the corporate machinery for his own purposes, even though acting in good faith, is estopped to deny its corporate capacity. Were the bank seeking recovery on the note, said the court, "we think it should be treated as a stranger to the corporation."

In *Hanson Sheep Co.* v. *Farmers & Traders' State Bank*, 53 Mont. 324, 163 Pac. 1151, it was held that, where the president of a corporation, who owned all of its stock with the exception of a small portion nominally held by his wife and brother, used the corporation named as a cloak under which to conduct his own business, a bank familiar with his manner of conducting the affairs of the corporation was justified in acting upon his oral direction in applying a deposit made in the corporate name to the payment of notes given to the bank by the president to secure private indebtedness. At the time the indebtedness was incurred, Hanson and his wife held all the stock, and, by the continued acquiescence of the latter permitting him to exercise all the powers and functions of the corporation, he became for the time the board of directors, with all the powers it possessed;

and hence it was held that the corporation could not question any act of his within the scope of its legal powers. The corporation did not have any board of directors, nor any secretary, and therefore no agency through which it could act legally. "The result was that the name of the corporation, except for the purpose of protecting strangers, became in effect the name of Hanson, and the business, so far as he conducted it in the corporate name, was his. When a corporation is in this condition, the public cannot be expected to know of the fact; hence the rule that, where strangers deal with it, it can be held for all obligations assumed by its officers in its name. Its legal capacity cannot be inquired into collaterally or questioned by a private citizen in a controversy between it and him. This can be done only by the state through its proper officer, * * * and for one of the causes prescribed by the statute." Hanson had used the credit of himself and the corporation to serve his own purpose. The court observed that, if he were permitted to hide behind the corporate entity to undo what he did in the adjustment of his and its debts and mulct the defendant in damages besides, he would have been aided in committing a fraud.

In legal effect, *United States Gypsum Co.* v. *Mackey Wall Plaster Co.,* 60 Mont. 132, 199 Pac. 249, it is not different from the *Hanson Case.*

There are some statements in *Scott* v. *Prescott,* 69 Mont. 540, 223 Pac. 490, which, if not considered with reference to the facts with which the court was dealing in that case, are mis-**[10]** leading. In considering the meaning and intent of the language of an opinion one must have constantly in mind the facts of the case in which the opinion is written. For, as Chief Justice Marshall observed, it is impossible so to use language as that general expressions apply in every instance with the same meaning to every condition of facts. (See *Chater* v. *San Francisco Sugar Refining Co.,* 19 Cal. 220.)

*Scott* v. *Prescott* was an action for a partnership accounting. Beyond question Scott and Prescott had been actively engaged in business as partners before Prescott attempted to form the

corporation known as South Pondera Ranch Company. Upon the facts found, the court held that South Pondera Ranch Company never came into existence nor functioned as a legal entity. It was not even a corporation de facto. It was not immune to collateral attack. (*Henderson* v. *School Dist. No. 44*, supra.) It was not alone the fact that two of the three incorporators were dummies which caused the court to declare that the corporation never came into existence. This was but one of the many facts which enabled Scott to maintain that the partnership was not abrogated by the attempted formation of the corporation, and that as to him the corporation did not exist. Such is, in effect, the vital holding of the court in that case. Scott had not participated in the formation of the pretended corporation, was not a stockholder, never received notice of or attended any meeting of its stockholders or directors, of which there were but two at the beginning of the ten years of its pretended existence. So the court held that the only function of South Pondera Ranch Company was to serve as a pseudonym under which the partnership of plaintiff and defendant was conducted. The court held in effect that one partner could not create a pretended corporation to which the other partner was not a party, and by that device defeat the partnership and deprive the partner of his interest in the partnership. The court pointed out the fact that Scott and Prescott were the only persons affected by the action. Neither the rights of the pretended corporation (if such there were) nor the rights of third persons, were in anywise involved. As the facts in *Scott* v. *Prescott* differ so widely from those in the cases under consideration, the opinion in that case has but little bearing upon the controlling question before us.

Upon the facts, and the law which springs out of the facts, and which controls these cases, it must be held, and cannot be held otherwise, that Rock Creek Ranch Company was not a partnership but a corporation. It would be idle to suggest that the evidence in these cases calls for the application of the rule that this court should look behind the corporate cloak in

order to circumvent fraud, prevent inequity or accomplish justice.

As the judgments in cases Nos. 6,190, 6,191, 6,193, 6,194, 6,195 and 6,196 have no legal foundation, they must be reversed.

2. Action No. 6,192. On January 11, 1922, the American National Bank of Helena loaned to the Rock Creek Ranch Company $25,500, and the company executed and delivered to the bank a note in that amount, payable on demand, and bearing interest at eight per cent per annum. The note was signed "Rock Creek Ranch Company, by C. B. Power, Vice President," and was indorsed by Power. It was also covered by the terms of the guaranty, which was executed and delivered by Burke and Power to the bank on May 27, 1912. Interest was paid to December 22, 1922.

On May 23, 1923, the bank demanded that Power pay the note, and he thereupon individually paid thereon the sum of $15,000. The remaining indebtedness upon the note was extended from time to time, and renewal notes were given therefor. It would seem that all were signed by Rock Creek Ranch Company, and were either signed or indorsed by Power. On July 26, 1923, Power individually paid interest to the amount of $931.34. The last renewal note was executed a week or ten days before the trial. It was signed "Rock Creek Ranch Company, by C. B. Power, President," and was either signed or indorsed by Power. Mr. Power testified that, if his individual borrowing from the bank had not been so large, he would have made the last renewal in his own name, rather than in the name of the Rock Creek Ranch Company, but, had he done so, he would have extended the amount borrowed by him above the amount which the bank was permitted to lend to an individual. But he testified the bank looks to him individually and not to the Rock Creek Ranch Company to pay the amount. In due time Power presented a personal claim against the estate of John H. Burke, deceased, based upon the guaranty, in which he sought to compel contribution for the money paid by

him because and on account of the guaranty. The defendant executor rejected the claim, whereupon the plaintiff began this suit. The court found that on or about December 20, 1926, Power settled with the American National Bank and paid it $15,300, and thereupon the guaranty was surrendered to him. It found further that Power had paid off the entire indebtedness, and that the Burke estate is liable to him for one-half of the amounts paid, with interest, amounting to $16,432.16, and thereupon rendered judgment against the defendant establishing plaintiff's claim in that amount, with procedural directions. Defendant thereupon appealed.

It is insisted by the defendant that the court erred in allowing the claim for more than one-half of the $15,000 principal and $931.34 interest, actually paid by Power under the guaranty agreement. It is argued that Power did not pay the remainder nor did he substitute his personal note for the original obligation; that what he did substitute was a new note of the principal debtor, Rock Creek Ranch Company, with his indorsement.

But we think the court's finding that Power settled and paid the amount due the American National Bank must be sustained. Upon any view it must be conceded that Power has paid $15,931.34 already upon the note and has made himself personally liable for the remainder. The bank looks to Power and not to the corporation to pay it. He is not a mere guarantor of payment, but is himself liable absolutely for the payment. The corporation is unable to pay; it is insolvent. We think, under the facts disclosed, that counsel for plaintiff are correct in saying that, upon the facts, Power is not only subrogated to all the rights which the bank had in the note, but is entitled to judgment, both upon the ground of contribution and by virtue of this subrogation.

The judgment in causes 6,190, 6,191, 6,193, 6,194, 6,195 and 6,196, are reversed, with directions to the district court to enter judgment in each cause for the defendant. The judgment in cause No. 6,192 is affirmed.